UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NATALIE PATTILLO and
COLTON CONROY, individually and
as next friends to A.B., C.D., and E.F.,
Plaintiffs,

v.                                                                         Docket No. 1:25-cv-588

JONATHAN FISHMAN,                                       **Jury Trial Demanded**
Defendant.

# COMPLAINT

1.  Plaintiffs Natalie Pattillo, Colton Conroy, and their three children (collectively, "the Family") were residential tenants of Defendant Jonathan Fishman at 222 Ivy Street in Providence, RI. Mr. Fishman failed to provide a lead disclosure to Ms. Pattillo or Mr. Conroy at the inception of their tenancy, and knew about—but never warned them of—the presence of lead-based paint in the home. Significant maintenance issues arose and were not promptly remediated, including peeling and flaking lead-based paint. The entire Family was tested and found to have been exposed to lead, and this is expected to affect them for the rest of their lives. After the family withheld rent to try to force remediation, Mr. Fishman retaliated by evicting them. The Family sues pursuant to the Residential Lead-Based Paint Hazard Reduction Act, 42 U.S.C. § 4852d, Federal regulations promulgated thereunder, and Rhode Island law governing residential tenancies.

   **I.     Parties.**

2. Plaintiff Natalie Pattillo is a natural person. She resides in Rhode Island. She is mother to A.B., C.D., and E.F. She was a residential tenant of Defendant Jonathan Fishman. At most relevant times to this action, she resided at 222 Ivy Street, Providence RI. She was forced to move out of that home following an eviction action.

3. Plaintiff Colton Conroy is a natural person. He resides in Rhode Island. He is father to C.D. and E.F. He was a residential tenant of Defendant Jonathan Fishman. At most relevant times to this action, he resided at 222 Ivy Street, Providence RI. He was forced to move out of that home following an eviction action.

4. "A.B." is a pseudonym. A.B. is a 13 year old girl. She sues through her next friend, Natalie Pattillo. Natalie Pattillo is A.B.'s mother and has sole physical and legal custody of her. At all relevant times A.B. resided with the Family, including at 222 Ivy Street.

5. "C.D." is a pseudonym. C.D. is a seven year old girl. She sues through her next friends and parents, Natalie Pattillo and Colton Conroy. At all relevant times C.D. resided with the Family, including at 222 Ivy Street.

6. "E.F." is a pseudonym. E.F. is a four year old boy. He sues through his next friends and parents, Natalie Pattillo and Colton Conroy. At all relevant times E.F. resided with the Family, including at 222 Ivy Street.

7. Defendant Jonathan Fishman is the owner of the premises at 222 Ivy Street in Providence, RI. He rented it to the Family and was their landlord. Upon information and belief, he resides at 410 Adirondack Drive, East Greenwich, RI 02818. He maintains a business address 555 N Main Street, #1368, Providence, RI 02904. He sent eviction notices to the Plaintiffs identifying that as his address.

8. A motion for A.B., C.D., and E.F. to proceed under pseudonyms and through their next friends as identified above will be filed concurrently with or soon after this complaint.

**II.     Jurisdiction and Venue.**

9. The Plaintiffs sue under the Residential Lead-Based Paint Hazard Reduction Act, 42 U.S.C. § 4852d. This Honorable Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331.

10. This Honorable Court has supplemental jurisdiction to hear claims raising under state law pursuant to 28 U.S.C. § 1367. The state claims brought in this action are so related to the Federal claims that they form part of the same case or controversy. All claims arise from the Plaintiffs' tenancy with the Defendant landlord and the landlord's unlawful acts and omissions, illegal under both Federal and state law, that harmed them.

11. Defendant Jonathan Fishman is subject to the personal jurisdiction of this Honorable Court because he resides in Rhode Island. Moreover, Defendant Jonathan Fishman is subject to the personal jurisdiction of this Honorable Court because he owns real property in Rhode Island, namely the premises at 222 Ivy Street in Providence.

12. Venue is proper because the rented residential premises that are the subject of this action are located within this District of Rhode Island.

**III.    Factual Basis for Claims.**

13. In May 2023, the Family lived in New York City. Natalie Pattillo and Colton Conroy were interested in moving to a smaller city. Dr. Conroy, a mathematical scientist, had begun work for a company out of Boston. Ms. Pattillo, a journalist and filmmaker, mostly worked remotely and figured she could move without significant professional disruption.

14. In or about May, 2023 E.F. attended a regularly scheduled pediatric appointment, was tested for the presence of lead in his blood, and was found to have no discernible lead.

15. Ms. Pattillo noticed an advertisement placed by Defendant Jonathan Fishman on a website called Craigslist listing the premises at 222 Ivy Street for rent. Ms. Pattillo and Mr. Fishman corresponded over email and arranged for Dr. Conroy to come up and tour the place with Mr. Fishman.

16. 222 Ivy Street appealed to Dr. Conroy because its $3,000/monthly rental price was within the Family's budget, was available concurrently with the end of the Family's New York lease, and was large enough for the Family.

17. During the tour, Dr. Conroy explained that he and Ms. Pattillo had three children, two of whom were under the age of 6. He asked Mr. Fishman about three safety issues: asbestos; wiring; and lead paint.

18. Mr. Fishman told Dr. Conroy about asbestos remediation that had been performed at the house to make it safe.

19. Mr. Fishman told Dr. Conroy that the house had updated wiring.

20. Mr. Fishman told Dr. Conroy that the house was lead safe.

21. Mr. Fishman explained to Dr. Conroy that he had lived in the home with his children when they were young and had made the house safe for children.

22. Mr. Fishman did not provide Dr. Conroy with any lead disclosure or EPA-approved lead hazard information pamphlet during the tour.

23. In certain areas of the home, paint was peeling, flaking, or chipping or otherwise unfinished at the time of Dr. Conroy's tour. Because of Mr. Fishman's representations, Dr. Conroy did not

believe that this posed a lead hazard. However, Dr. Conroy wanted to make sure that the issue was remediated for other safety and aesthetic reasons.

24. Dr. Conroy asked if Mr. Fishman would paint the interior of 222 Ivy Street. Mr. Fishman and Dr. Conroy verbally agreed that if the Family rented 222 Ivy Street, Mr. Fishman would have the interior of the home painted prior to their move in.

25. Following the tour, Ms. Pattillo and Dr. Conroy decided to rent 222 Ivy Street. The safety of the Family's children is important to Ms. Pattillo and Dr. Conroy. They would not have rented 222 Ivy Street in the absence of Mr. Fishman's representations.

26. On May 25, 2023, the parties signed a lease electronically via interstate wire communication. The lease was prepared exclusively by the Defendant, who sent it to Ms. Pattillo and Dr. Conroy for execution. The move-in date was July 1, 2023. The rent was $3,000/monthly.

27. Federal regulations at 24 C.F.R. § 35.88 and 40 C.F.R. § 745.107 require that before a residential tenant becomes obligated under a lease, the landlord must: provide the tenant with an EPA-approved lead hazard information pamphlet, such as the government-authored pamphlet entitled "Protect Your Family from Lead in Your Home"; disclose known lead-based paint and lead-based paint hazards; and provide the tenant any records pertaining to lead-based paint and lead-based paint hazards in the leased home.

28. At the time the parties signed the lease, Mr. Fishman had not provided Ms. Pattillo or Dr. Conroy with any EPA-approved lead hazard information pamphlet.

29. Mr. Fishman did not provide any lead disclosure or "Protect Your Family from Lead in Your Home" pamphlet to the Family at, before, or after move-in.

28. Mr. Fishman did not disclose any lead-based paint or lead-based paint hazards to the Family prior to their signing the lease or moving in.

5

29. Mr. Fishman did not provide the Family with any records of lead-based paint or lead-based paint hazards prior to their signing the lease or moving in.

30. Having moved out of their New York apartment, the Family arrived at 222 Ivy Street on or about June 30, 2023. The Family learned that Mr. Fishman had not painted the interior as promised.

31. The Family also found trash and broken furniture left on the sidewalk and in the interior of the home.

32. Ms. Pattillo and Dr. Conroy, having moved out of their last apartment and to Rhode Island, did not want to start off their new tenancy with a dispute.

33. Ms. Pattillo, Dr. Conroy, and another family member cleaned up much of the trash and junk.

34. Upon moving in and in July 2023, the Family notified Mr. Fishman of a number of issues with 222 Ivy Street, including:

    a.    The promised re-painting not having been completed;

    b.    A broken window;

    c.    Holes and cracks in the walls and ceilings;

    d.    Peeling and chipping paint;

    e.    Left behind objects and trash.

35. Mr. Fishman took no action on these issues for weeks.

36. On August 5, 2023, Mr. Fishman notified the Family that a contractor, Jerry, would be coming the next day.

37. The contractor named Jerry did come for a walkthrough the next day. Ms. Pattillo and Dr. Conroy pointed out a number of outstanding issues with 222 Ivy Street, including:

    a.    Holes and cracks in the walls and ceiling;

    b.    The mail slot was stuffed with newspaper;

    c.    The broken window;

    d.    A broken balcony door;

    e.    Deteriorating flooring in one of the bedrooms;

    f.    Weak bathroom faucet pressure;

    g.    Peeling and deteriorating paint through a number of areas in the home;

    h.    That the interior had not been painted.

38. The contractor Jerry was Mr. Fishman's agent.

39. Jerry painted a wall in the front entryway but did not paint the interior. He also did not paint the trim, baseboards or doorframes in the interior entryway. He failed to fix the broken bathroom window, address peeling paint, to fix the kitchen cabinet, and to fix the broken window.

40. On August 21, 2023. Dr. Conroy texted Mr. Fishman to state that there were still unaddressed issues and sent photos of holes in the walls. Mr. Fishman texted that "Jerry's all done for now".

41. On August 25, 2023, Mr. Fishman visited 222 Ivy Street. Dr. Conroy pointed out the unaddressed issues. Mr. Fishman stated that no more painting or work would be done.

42. Mr. Fishman gave Dr. Conroy and Ms. Pattillo permission to paint the interior themselves.

43. The Family spent more than $300 to obtain paint and supplies to repaint the interior and address the peeling and chipping paint.

44. In early December, the Family noticed flaking, dust, and chipping in C.D.'s closet. At this point C.D. was five years old. She used that area as a "peace corner", reading space, and stored dress-up clothes there.

45. Dr. Conroy texted Mr. Fishman images from C.D.'s closet. Mr. Fishman assured Dr. Conroy that no asbestos or other hazards were present in the closet.

46. In January 2024, the home began to show signs of water damage.

47. On January 10, 2024 Dr. Conroy texted that water had intruded into the basement. Mr. Fishman responded that nothing could be done but that this happens "only a small number of times per year."

48. In late February, the Family contacted Mr. Fishman to advise that an interior ceiling was leaking and sent Mr. Fishman a photograph of a hole in the ceiling.

49. Mr. Fishman told the Family that the interior damage would not be addressed until repairs were made to the roof.

50. Mr. Fishman did not have the roof replaced until mid-April. However, no one came to repair the interior damage caused by the leaks. Mr. Fishman texted Dr. Conroy to let him know that he would be in touch about when that damage would be remediated.

51. Over the course of that Winter, E.F. began to exhibit new behaviors and symptoms, such as irritability, behavioral problems, and stomach upset. These behaviors and symptoms are consistent with lead poisoning.

52. On May 6, 2024, E.F. had an annual checkup. Testing revealed the presence of lead in his blood. E.F. had never before tested positive for lead.

53. At this time, because of Mr. Fishman's previous representations that the home was safe, Ms. Pattillo and Dr. Conroy did not fully realize the importance of the positive test result for lead in E.F.'s blood or the source of the lead exposure.

54. On May 25, 2024, Mr. Fishman and a contractor did a walkthrough for the ceiling damage and peeling paint.

55. During the time of the walkthrough, paint was visibly peeling from the ceiling of several rooms, including the children's bedrooms.

56. Beginning in Winter and Spring of 2024, A.B. coughed frequently and often had difficulty breathing in her bedroom. These symptoms are consistent with water intrusion and mold in a human living space.

57. In July 2024, C.D. found mushrooms growing out of one of the baseboards in a bedroom at 222 Ivy Street. The mushrooms grew out of an area that had already been pointed out to Mr. Fishman as an area of concern in August 2023, and about which he had done nothing.

58. Ms. Pattillo then did some research on 222 Ivy Street. She learned that the home had no valid lead certificate. This was in violation of Rhode Island Department of Health Regulations at 216-RICR-50-15-3.5.6(B). She wrote to Mr. Fishman to confront him about this.

59. Mr. Fishman said he wanted to speak in person. Mr. Fishman, Ms. Pattillo, and Dr. Conroy met in person on July 10, 2024. In that meeting, Mr. Fishman admitted that he had failed to repair roof issues that had existed before their tenancy due to cost. He also opined that he thought it was unlikely he would be able to get a valid lead certificate. He continued to maintain that the home was safe for children.

60. That evening, Ms. Pattillo searched for Mr. Fishman on the local Recorder of Deeds database. She found that Mr. Fishman had been cited by the City of Providence's Department of Inspection and Standards in October 2017 for *inter alia* lead paint at 222 Ivy Street.

61. Ms. Pattillo sent a public records request to the City of Providence. She then obtained records stating that Mr. Fishman had been sued by the City over lead paint in 2018.

62. Pursuant to 24 C.F.R. § 35.88, these records should have been provided to prospective renters at or before the time of signing the lease.

63. Had Mr. Fishman provided Ms. Pattillo and Dr. Conroy with these records, they would not have chosen to rent 222 Ivy Street or to move in with their children.

64. Had Ms. Pattillo and Dr. Conroy known about these records, they would have been more careful with their children at home during the tenancy.

65. A Certified Lead Inspector from Environmental Lead Detection, Inc. inspected the home on July 11, 2024. She found significant and numerous unsafe lead levels and hazards, including in the children's bedrooms, playroom, closets, and the home's common areas, as well as outside the home, near where the children played frequently. The lead inspection report noted that there were numerous surfaces, such as several door jambs and cabinet doors, covered with deteriorating lead-based paint. The rubbing of door jambs in the children's rooms created hazardous lead dust, which can be invisible to the human eye, to be released in several areas of the home.

66. To limit the continued release of hazardous lead dust, the lead inspector recommended to Ms. Pattillo and Dr. Conroy to wet-clean the floor surfaces often and to cover lead hazardous areas, such as the door jambs with tape, and the several exposed walls in C.D. 's closet with cardboard and trash bags

67. Ms. Pattillo and Dr. Conroy explained the issues with lead hazards in the home to A.B. and C.D., so that they would avoid lead hazards like dust and numerous areas that they had taped or covered to limit exposure.

68. E.F. was too young to understand such an explanation. The explanation caused the children to cry and lose sleep.

69. On July 17, 2024, feeling unsafe at the house, the Family booked a hotel room at a Hampton Inn. They were not able to afford alternative accommodations like this on an ongoing basis.

10

70. The Family hired an attorney-at-law to deal with the issue. They eventually paid the attorney $2,000. The attorney advised them to withhold August's rent until and unless the lead hazards were remediated. No remediation had begun by August 1st and the Family withheld its rent.

71. On August 6, 2024 Mr. Fishman emailed Dr. Conroy and Ms. Pattillo to ask for their permission to use a contractor that was not lead certified for the remediation.

72. No lead hazard remediation work began until August 16, 2024.

73. On August 16, 2024 one of the remediators said that the Family should relocate during the work. The Family had not been given notice that they would have to relocate. That night, the Family moved to a campground. Mr. Fishman continued to opine that the home was safe for the Family.

74. On August 28, 2024, with the Family still displaced from their home, Dr. Conroy returned to find many of the Family's belongings covered in dust, including toys and other objects regularly handled by children.

75. On August 29, 2024, Dr. Conroy and Ms. Pattillo, using protective devices advised by the lead inspector, began cleaning lead paint dust left throughout the home by the contractors. They believed that this was the landlord's responsibility, but were displaced and wanted to hasten the time when they could go home, especially because the children's first day of school was approaching. Dr. Conroy and Ms. Pattillo had to pay for the protective devices.

77. The Family was only able to re-enter 222 Ivy Street on September 1, 2024. However, lead hazard remediation continued.

78. On or about September 7, 2024 the Family received an eviction notice for non-payment of rent. This notice was sent in retaliation for Ms. Pattillo and Dr. Conroy's decision to withhold their rent until the lead hazards had been remediated.

11

79. On September 10, 2024, the City of Providence cited Mr. Fishman for his lack of a lead mitigation certificate of conformance.

80. On or about September 27, 2024, Mr. Fishman caused Ms. Pattillo and Dr. Conroy to be served with a summons and complaint for non-payment of rent. The action was filed in retaliation for Ms. Pattillo and Dr. Conroy's decision to withhold their rent until the lead hazards had been remediated.

81. On September 29, 2024, Mr. Fishman emailed Ms. Pattillo and Dr. Conroy to say that a lead inspection report had revealed an additional windowsill that was hazardous and to ask permission for a remediator to enter.

82. Despite the ongoing lead hazards and remediation, no valid certificate of lead conformance as required per Rhode Island law, and an active EPA investigation of Mr. Fishman and 220 and 222 Ivy St., Mr. Fishman proceeded with the eviction action for non-payment of rent. The action sought rent even for periods of time when Mr. Fishman's own contractor had asked the Family to be out of their home.

83. The Family's attorney failed to enter an appearance in Rhode Island state District Court and missed the eviction trial. The Family appealed for a *de novo* trial in the Rhode Island state Superior Court. The Family's attorney failed to file an answer. Mr. Fishman and his counsel used these failings to force the Family to move out of the home.

84. Dr. Conroy and Ms. Pattillo did not waive, exhaust, release or otherwise lose any rights or claims against Mr. Fishman in the state court eviction process, except for the right to continue to occupy 222 Ivy Street and to retain the withheld rent.

85. The Family paid Mr. Fishman all withheld rent and moved out.

86. Mr. Fishman's actions and omissions during their tenancy caused each member of the Family profound emotional distress.

87. Ms. Pattillo suffered from panic attacks, prolonged difficulty sleeping, heart palpitations, sadness, worry and anxiety from the time when she discovered the history of lead violations in the home through the eviction process and forced move-out.

88. During this period, Dr. Conroy suffered numerous tension headaches, difficulty sleeping, anxiety, and anger.

89. Ms. Pattillo and Dr. Conroy continue to experience anxiety and emotional distress as they worry about the harm that the lead exposure and eviction will have on their children.

90. A.B. has experienced domestic violence causing displacement, and has Post-Traumatic Stress Disorder as a result. The displacement of the Family during the lead remediation and eviction, and ongoing fears about lead contamination caused these symptoms to re-appear. She has had a panic attack, skin breakout, and other symptoms of anxiety and emotional distress.

91. C.D. has had difficulty sleeping and night terrors since the lead hazards were explained to her. The Family's displacement until right before the first day of kindergarten caused her immense anxiety. Many of her favorite toys were thrown out due to being left uncovered during the remediation and getting contaminated with lead dust.

92. E.F. cried nightly and had extreme difficulty sleeping during the Family's displacement.

93. Ms. Pattillo and Dr. Conroy missed significant amounts of worktime during and because of the lead remediation, displacement, and court that arose from Mr. Fishman's eviction against them.

94. On or about September 4, 2025, the entire family was tested for the presence of lead in their bodies by a board-certified medical physicist. Each member of the Family was found to have

markedly increased bone lead which would substantially impair health. According to the New England Journal of Medicine, the Family's intake of lead into their bodies subjects them to lifelong risks, including cognitive deficiencies in the children, kidney failure, hypertension, and cardiovascular disease. *See* Bruce Lanphear et al., "Lead Poisoning", 391 New Eng. J. Med. 1621 (2024) (*available* https://www.nejm.org/doi/full/10.1056/NEJMra2402527). Upon information and belief, E.F.'s behavior has already been affected by the cognitive impat of his lead intake.

### IV. Appropriateness of Punitive Damages

95. Mr. Fishman's conduct in this matter was reprehensible. Mr. Fishman knew from the outset of their interactions that Dr. Conroy and Ms. Pattillo were looking to lease a home for themselves and their three children, including a toddler and a 4-year-old. He knew, but they did not, that 222 Ivy Street not only had extant lead hazards but that there had been litigation for them. He also knew that 222 Ivy Street had an incompletely weatherproofed roof that he had chosen not to fix due to the cost, exposing the Family to peeling lead paint and difficulty breathing.

96. Mr. Fishman's conduct evinced an indifference to and reckless disregard for the health or safety of others, including children.

97. Punitive damages are appropriate to punish and deter this conduct. Mr. Fishman reasonably expected to get away with his misconduct. Had Ms. Pattillo not been a journalist with the ability to ferret out documents, Mr. Fishman's perfidy would likely never have been discovered.

98. Mr. Fishman caused harm to children through malice, trickery, or deceit.

99. Because of the half-life of lead, and the inherent difficulty of proving damages related to the future development of young persons, actual damages are difficult to quantify.

100. Mr. Fishman was on notice as a matter of law that his conduct risked significant criminal and civil penalties, and chose to carry this conduct forth anyway.

## V.     Causes of Action

### First Cause of Action: Violation of the Residential Lead-Based Paint Hazard Reduction Act, 42 U.S.C. § 4852d

101. The Plaintiffs restate and reallege all allegations in this complaint.

102. The Plaintiffs leased "target housing" within the meaning of 42 U.S.C. § 4852d from the Defendant. 222 Ivy Street was constructed before 1978.

103. In obligating Ms. Pattillo and Dr. Conroy to a residential lease for target housing, the Defendant violated regulations promulgated by the Secretary of the Department of Housing and Urban Development and the Administrator of the Environmental Protection Agency in the following ways:

1. The Defendant failed to provide the Plaintiffs with an EPA-approved lead hazard information pamphlet in violation of 24 C.F.R. § 35.88(a)(1) and 40 C.F.R. § 745.107(a)(1).

2. The Defendant failed to disclose known lead-based paint, and known lead-based paint hazards in the leased housing to the Family, in violation of 24 C.F.R. § 35.88(a)(2) and 40 C.F.R. § 745.107(a)(2)

3. The Defendant failed to provide available records pertaining to lead-based paint and lead-based paint hazards, including litigation records, to the Family, in violation of 24 C.F.R. § 35.88(a)(4) and 40 C.F.R. § 745.107(a)(4).

104. All Plaintiffs are lessees under the lease. All Plaintiffs were intended by the parties to the lease to occupy the leased housing during the lease term.

105. The Defendant's failures were committed knowingly.

106. The Defendant's violation of 42 U.S.C. § 4852d, 24 C.F.R. § 35 and 40 C.F.R. § 745 actually and proximately caused the Plaintiffs harm, including: monies spent renting a defective home; lead poisoning and resulting personal injury; eviction, displacement, and related costs; damaged and lost personal property; emotional distress and physical symptoms of emotional distress; and lost wages.

107. The Defendant is liable to the Plaintiffs for their damages, trebled, punitive damages, their costs, and a reasonable attorney's fee.

**Second Cause of Action: Failure to Maintain Residential Rental Property in Violation of R.I. G.L. §§ 34-18-22 and 34-18-28**

108. The Plaintiffs restate and reallege all other allegations in this pleading.

109. The Defendant was a "landlord" within the meaning of R.I. G.L. §§ 34-18-22 and 34-18-28.

110. The Defendant failed to comply with the requirements of applicable building and housing codes affecting health and safety, including but not limited to 216-RICR-50-15-3, governing lead hazards and lead certificates.

111. The Defendant was aware of certain conditions in the leased premises that made them unfit and uninhabitable, including:

    a. Lead paint hazards;

    b. Cracks and holes in the walls;

    c. Broken windows; and,

    d. Lack of weatherproofing and water intrusion.

112. The Defendant failed to promptly make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition.

113. The Defendant's violations of R.I. G.L. §§ 34-18-22 and 34-18-28 were willful.

114. The Defendant's violations R.I. G.L. §§ 34-18-22 and 34-18-28 actually and proximately caused the Plaintiffs to harm, including: monies spent renting a defective home; lead poisoning and resulting personal injury; difficulty breathing; eviction, displacement, and related costs; damaged and lost personal property; emotional distress and physical symptoms of emotional distress; and lost wages.

115. The Defendant is liable to the Plaintiffs for their damages, trebled, punitive damages, their costs, and a reasonable attorney's fee.

**Third Cause of Action: Wrongful Eviction in Violation of R.I. G.L. §§ 34-18-34 and 34-18-44**

116. The Plaintiffs restate and reallege all other allegations in this pleading.

117. The Defendant is a landlord within the meaning of R.I. G.L. § 34-18-44.

118. The Defendant unlawfully removed or excluded the Plaintiffs from their home from August 16, 2024 to September 1, 2024 because the landlord's failure to maintain the premises made it too unsafe to live in, working an ouster.

119. The Defendant unlawfully filed and prosecuted a state court eviction action against the Plaintiffs in reprisal for their lawful act of rent withholding.

120. The Defendant took and recovered possession of the dwelling unit from the Plaintiffs other than as permitted under R.I. G.L. § 34-18.

121. The Defendant's violations R.I. G.L. §§ 34-18-34 and 34-18-44 actually and proximately caused the Plaintiffs harm, including: costs of renting alternative lodgings; damaged and lost personal property; emotional distress and physical symptoms of emotional distress; and lost wages.

122. The Defendant is liable to the Plaintiffs for threefold their actual damages, or for three months' periodic rent, whichever is greater, and a reasonable attorney's fee.

17

**Fourth Cause of Action: Retaliation in Violation of R.I. G.L. §§ 34-18-34 and 34-18-46**

123. The Plaintiffs restate and reallege all other allegations in this pleading.

124. The Defendant is a landlord within the meaning of R.I. G.L. § 34-18-46.

125. The Plaintiffs are tenants within the meaning of R.I. G.L. § 34-18-46.

126. The Plaintiffs complained to the landlord and to a relevant governmental agency charged with responsibility for enforcement of a building code or housing code of a violation applicable to the premises materially affecting health and safety.

127. The Plaintiffs availed themselves of other lawful rights and remedies, including valid rent withholding.

128. The Defendant threatened to bring and brought an action for possession against the Plaintiffs in retaliation.

129. The Defendant's violations R.I. G.L. §§ 34-18-34 and 34-18-46 actually and proximately caused the Plaintiffs harm, including: costs of renting alternative lodgings; damaged and lost personal property; emotional distress and physical symptoms of emotional distress; and lost wages.

130. The Defendant is liable to the Plaintiffs for threefold their actual damages, or for three months' periodic rent, whichever is greater, and a reasonable attorney's fee.

**Fifth Cause of Action: Negligence**

131. The Plaintiffs restate and reallege all other allegations in this pleading.

132. In becoming their landlord, Defendant assumed a duty of care to provide and maintain fit, habitable, and safe premises to the Plaintiffs.

133. The Defendant breached this duty. The Defendant failed to provide fit, habitable and safe premises to the Plaintiffs and failed to use reasonable care with respect to the fitness, habitability, and safety of the premises.

134. The Defendant's breach actually and proximately caused the Plaintiffs harm, including: monies spent renting a defective home; lead poisoning and resulting personal injury; difficulty breathing; eviction, displacement, and related costs; damaged and lost personal property; emotional distress and physical symptoms of emotional distress; and lost wages.

135. The Defendant is liable to the Plaintiffs for their actual damages.

### Sixth Cause of Action: Breach of Warranty

136. The Plaintiffs restate and reallege all other allegations in this pleading.

137. In becoming their landlord, Defendant warranted that he would put the Family in possession of fit, habitable, and safe premises, maintain the same, and allow them to quietly enjoy the same.

138. The Defendant breached these warranties.

139. The Defendant's breach actually and proximately caused the Plaintiffs harm, including: monies spent renting a defective home; lead poisoning and resulting personal injury; difficulty breathing; eviction, displacement, and related costs; damaged and lost personal property; emotional distress and physical symptoms of emotional distress; and lost wages.

140. The Defendant is liable to the Plaintiffs for their actual damages and a reasonable attorney's fee.

**Jury Demand: The Plaintiffs Demand a Trial by Jury**

**VI.    Prayer**

Wherefore, the Plaintiffs request that this Honorable Court:

141. Pursuant to Fed. R. Civ. P. 17(c), allow A.B., C.D., and D.F. to be represented by their identified next friends and to proceed under pseudonyms;

142. Enter judgment in their favor on all claims;

143. Award them their damages, trebled, plus a reasonable attorney's fee and the costs of the action;

144. Award them all statutory damages they are entitled to under the provisions of the Rhode Island Residential Landlord and Tenant Act, R.I. G.L. § 34-18;

145. Award them punitive damages;

146. Provide them with any other relief as is just and equitable under the circumstances.

                Respectfully submitted,

                Plaintiffs,
                By their attorney,

Date: November 5, 2025        /s/Francis Curren/s/
                Francis Curren
                Curren Law, PLLC
                RI Attorney Reg. # 11032
                PO Box 5891
                Providence, RI 02903
                (401) 406-5550
                frankcurren@currenlaw.com